

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**07/08/2009**

| | | |
|---|---|---|
| IN RE: | § | |
| RANDOLPH DOMINIC GUEVARA | § | CASE NO: 08-30201 |
| Debtor(s) | § | |
| | § | CHAPTER  7 |
| | § | |
| PNK(LAKE CHARLES), LLC; dba | § | |
| L'AUBERGE DU LAC | § | |
| Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 08-3151 |
| | § | |
| RANDOLPH DOMINIC GUEVARA | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this adversary proceeding, plaintiff PNK (LAKE CHARLES), L.L.C. d/b/a L'auberge du Lac ("PNK") alleges (i) that debtor Randolph Dominic Guevara ("Debtor") is indebted to PNK in the principal amount of $20,000 for a gambling "marker" and that the debt is not dischargeable in chapter 7: 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).  Notwithstanding Debtor's failure to respond to the complaint in this adversary proceeding, for reasons set forth below, and by separate judgment entered concurrently with this memorandum, the Court concludes that Fifth Circuit precedent in the *Aubin* cases binds this Court to conclude that there is no claim on which relief can be granted.

### I. PLEADINGS & PROCEDURAL HISTORY

Debtor traveled to the L'auberge du Lac Casino in Lake Charles, Louisiana in October 2006. While there, Debtor signed a number of gambling "markers" to obtain funds with which to gamble. These markers were payable from Debtor's bank account.[1] On January 17, 2008, Debtor

---

[1] *Carnival Leisure Indus. v. Aubin, Ltd. (Aubin II)*, 53 F.3d 716, 717 n.1 (5th Cir. 1995) explains what a "marker" is and how the process works.

> A marker is a preprinted form, resembling a bank check or draft that a gambler with preapproved credit signs while on the casino floor in order to obtain tokens or chips to play a casino game. If the player wins, he can redeem the marker with an equivalent amount of chips, and he can then exchange the remainder of the chips for cash. A losing player can redeem the marker with any remaining casino chips he may have, and pay the balance with cash or by giving a personal check. If the marker is not paid within 30 days by cash, check or casino chips, the casino presents the

filed a voluntary petition commencing this case under chapter 7 case of the Bankruptcy Code.[2] On page 2 of Bankruptcy Schedule F, Debtor listed PNK as an unsecured creditor holding a claim, which Debtor described as a "gambling debt," in the amount of $20,105.[3] PNK timely filed this adversary proceeding objecting to the dischargeability of its claim under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B).[4] PNK's complaint alleged that PNK extended Debtor $20,000 of credit in the form of gambling "markers" and/or checks to be drawn against Debtor's bank account and that this debt was not dischargeable in bankruptcy because: (i) Debtor's obtaining and accepting such an extension credit when Debtor knew he was insolvent and would not repay the extension constituted an extension of credit obtained by false pretenses, false representation, or actual fraud under Bankruptcy Code § 523(a)(2)(A), and (ii) Debtor obtained such credit by use of a statement in writing that was materially false with respect to Debtor's financial condition on which PNK reasonably relied and which Debtor caused to be made or published with intent to deceive, satisfying Bankruptcy Code § 523(a)(2)(B).[5] The Court set a pretrial conference for July 2, 2008, but neither party made an appearance. The Court dismissed the case for want of prosecution and noted that *Carnival Leisure Industries, Ltd. v. Aubin* (*Aubin II*) 53 F.3d 716 (5th Cir. 1995) suggested that PNK's complaint possibly failed to state a claim on which relief could be granted.[6]

PNK filed a motion to reinstate the case alleging that counsel for PNK had simply miss-calendared the status conference.[7] The Court vacated the dismissal[8] rescheduled the pretrial conference to September 12, required PNK to file a memorandum of authorities attempting to distinguish the *Aubin* line of cases, and set certain procedural requirements for PNK to seek a default judgment. PNK satisfied those requirements.

## II.     THE LEGAL CONTENTIONS

PNK commenced this adversary proceeding to deny discharge of its claim under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(2)(B). Additionally, PNK alleges that the *Aubin* line does not render its claim unenforceable, and it seeks default judgment against Debtor.

---

marker for payment, as a check or draft, to the bank designated by the player on the initial application for casino credit.
*Id.*
[2] *In re Randolph Dominic Guevara*, Case No. 08-30201, (Bankr. S.D. Tex. Jan. 17, 2008).
[3] *Id.* (Docket #1). Debtor actually listed the creditor as "L'auberge du Lac Hotel and Casino," which is PNK's d/b/a name.
[4] Docket #1.
[5] Docket #1. PNK contended that the markers and checks constituted the writing for purposes of § 523(a)(2)(B). *Id.*
[6] Docket #8.
[7] Docket #10.
[8] Docket #11.

### III. CONCLUSIONS OF LAW

A. The Debt to PNK

PNK first alleges that Debtor incurred a $20,000 obligation to PNK via an extension of credit during Debtor's visit to L'auberge du Lac. As set out in more detail above, Debtor's sworn bankruptcy schedules list an undisputed, liquidated, non-contingent debt to PNK for $20,000. Debtor has neither disputed the debt in a responsive pleading nor appeared at any of the pretrial conferences, and PNK has submitted evidence of the debt in the form of facsimiles of the markers and checks. If the Court's inquiry ended here, it would be clear that Debtor owed PNK $20,000. However, the *Aubin* line requires further analysis.

Debtor listed PNK's claim as a "gambling debt" on its schedules. PNK does not allege that the debt was anything else. In *Aubin I*, the Fifth Circuit held that "the public policy in Texas against gambling on credit prevents enforcement of a debt incurred for the purpose of gambling and provided by a participant in the gambling activity."[9] In the memorandum of authorities that the Court required, PNK attempts to distinguish *Aubin.*

B. PNK Argues that Louisiana Law Applies

PNK argues that Louisiana law, and not Texas law, applies. First, PNK argues that Louisiana law was chosen by the parties. Second, PNK argues that Texas choice of law rules support application of Louisiana law.

1. Contractual Choice of Louisiana Law

PNK's customer service agreement states, "This agreement shall be governed by the laws of the State of Louisiana."[10] In 1990, the Texas Supreme Court stated that Texas observes the "party autonomy" rule, which is shorthand for the policy that courts generally respect contractual choice of law provisions.[11] The court was careful to note, however, that the party autonomy rule was limited. Specifically, parties to a contract cannot nor "by agreement thwart or offend the public policy of the state the law of which ought otherwise to apply."[12] The court turned to § 187 of the Restatement (Second) of Conflict of Laws. Section 187 provides:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is

---

[9] *Carnival Leisure Indus. Ltd. v. Aubin (Aubin I)*, 938 F.2d 624, 626 (5th Cir. 1991), *rev'd on other grounds*, 53 F.3d 716 (5th Cir. 1995).
[10] Docket #16, Exhibit D.
[11] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990).
[12] *Id.*

> one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless . . .
>
> > (a) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

It is clear from the facts that Louisiana has a substantial relationship to PNK and the transaction. Debtor traveled there to gamble, and the transaction, i.e., the extension of credit, occurred there. There is certainly a reasonable basis for the parties' choice of Louisiana, namely, that the casino is located there. Therefore, § 187(2)(a) and the parties choice of law would call for application of Louisiana law unless this case falls in the public policy exception of § 187(2)(b).

2. Texas Choice of Law Principles

The Texas Supreme Court provided instruction for application of § 187(2)(b) in *DeSantis*: first, whether Texas has a more significant relationship to these parties and their transaction than Louisiana; second, whether Texas has a materially greater interest than Louisiana in deciding the enforceability of the debt in this case; and third, whether the application of Louisiana law in this case would be contrary to a fundamental policy of Texas.[13]

> a. Does Texas Have a More Significant Relationship to These Parties and Their Transaction than Louisiana?

While Louisiana certainly has strong relationships with PNK and the transaction, Texas' relationship to the parties and transaction is much more significant. Again, deferring to *DeSantis* for guidance:

> Section 188 of the RESTATEMENT provides that a contract is to be governed by the law of the state that "has the most significant relationship to the transaction and the parties", taking into account various contacts in light of the basic conflict of laws principles of section 6 of the RESTATEMENT.[14]

Here, the principles of § 6 of the Restatement (Second) of Conflicts cut in favor of Texas having the more significant relationship to the parties and their transaction.[15] Debtor is a citizen

---

[13] *Id.* This methodology is also known as the "most significant relationship" test, which the Texas Supreme Court adopted in *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).
[14] *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 188; 6 (1988)).
[15] As held by the Supreme Court of Texas in *Gutierrez v. Collins*, "[the] analysis should not turn on the number of contacts, but more importantly on the qualitative nature of those contacts as affected by the policy factors enumerated in [§] 6." Section 6 states:

of Texas. Although Debtor entered into the contract in Louisiana, Debtor's performance under the contract was to be rendered in Texas, i.e., Debtor was to pay PNK using funds from his Texas bank account. The gist of the contract was that PNK extended credit in Louisiana, and Debtor was to repay his debts, presumably in Texas, from his Texas bank account. The Fifth Circuit plainly states, "[T]he Texas Supreme Court has stated that where collection of the gambling debt entails the cashing of a check (inferentially of a Texas resident) on a Texas bank, Texas courts apply Texas law."[16] It is beyond question that collection of this particular gambling debt entails the cashing of a check of a Texas resident on a Texas bank. Accordingly, the Court finds that Texas has a more significant relationship to these parties and their transactions than Louisiana.

        b.        Does Texas Have a Materially Greater Interest than Louisiana in Deciding the Enforceability of the Debt in This Case?

PNK argues that Louisiana has a materially greater interest than Texas in deciding whether the debt in this case is enforceable. Louisiana's interest in this case is protection of the State's casino industry. Texas' interest involves enforcement of a broad public policy: prohibiting debt resulting from gambling. The effect of a $20,000 loss to a Louisiana casino is, presumably, minor. The effect of a $20,000 nondischargeable debt for a bankruptcy Texas resident is, presumably, quite significant. *DeSantis* recognized that "it is always problematic for one state to balance its own interests fairly against those of another state."[17] But here, as in *DeSantis*, "the circumstances of this case leave little doubt, if any, that Texas has a materially greater interest than [Louisiana] in deciding whether the [debt] in this case should be enforced."[18] Accordingly, the Court finds that Texas has a materially greater interest than Louisiana in deciding whether the debt in this case is enforceable.

    3.    Would the Application of Louisiana Law in this Case Be Contrary to a Fundamental Policy of Texas?

Enforcement of the debt would be contrary to a fundamental policy of Texas. In its memorandum of authorities, PNK states, "An argument that public policy would preclude enforcement of gambling debts is incorrect. Public policy exceptions to the enforcement of rights

---

    (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
    (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.
RESTATEMENT (SECOND) OF CONFLICT OF LAWS §6 (1988).
[16] *Aubin I* at, 625 (citing *Castilleja v. Camero*, 414 S.W.2d 424, 427 (Tex. 1967)).
[17] *DeSantis v. Wackenhut Corp.*, 793 S.W.2d at 679.
[18] *Id.*

based on foreign laws is [sic] to be construed narrowly."[19] PNK then argues that the state-sponsored Texas lottery, "several legislative attempts to allow slot and table gaming in Texas," "several horse racing tracks where gaming is allowed," and "a national increase in legal gaming" since *Aubin I* was decided all mean that applying Louisiana law and enforcing the debt would not be contrary to a fundamental policy of Texas. The Fifth Circuit discussed that contention in *Aubin I*:

> Carnival Leisure claims, however, that since 1973 the public policy of Texas toward gambling and the legality of gambling debts has changed. Although gambling is generally proscribed in Texas, Tex. Penal Code §§ 47.01-.08, there has been an exception for the "social" gambler since 1973. Tex. Penal Code § 47.02(b). The Texas legislature enacted the Bingo Enabling Act in 1981, Tex.Rev.Civ.Stat.Ann. art. 179d (Vernon 1991), the Texas Racing Act in 1986, Tex.Rev.Civ.Stat.Ann. art. 179e (Vernon 1991), and the Charitable Raffle Enabling Act in 1989, Tex.Rev.Civ.Stat.Ann. art. 179f (Vernon 1991). Provisions were added to the Texas Penal Code excepting these three activities from its general proscription against gambling. Tex. Penal Code §§ 47.02(c), 47.10 (bingo exception); Tex. Penal Code § 47.11 (racing exception); Tex. Penal Code §§ 47.02(c), 47.12 (raffling exception).
>
> The enactment of statutes legalizing some forms of gambling admittedly evidences some dissipation or narrowing of public disapproval of gambling. However, such statutes hardly introduce a judicially cognizable change in public policy with respect to gambling generally. *See GNLV Corp. v. Jackson*, 736 S.W.2d 893, 894 (Tex. App.1987) (stating in dicta that "Texas has a well-established public policy of not recognizing or enforcing rights arising from gambling transactions.") (citation omitted). The social gambling permitted by section 47.02(b) is confined to private places where no one receives any benefit other than his personal winnings and all participants are subject to the same risks, a categorically vastly different kind of activity from the sort involved here. Moreover, Johnston was decided the same year section 47.02(b) was enacted, and Jackson was handed down over a decade later. The racing, bingo, and raffling exceptions are narrow, strictly regulated exceptions to a broad public policy in Texas against most forms of gambling. Further, the kind of gambling engaged in here is not of the sort permitted by any of these exceptions.
>
> Even if gambling legislation in Texas were evidence sufficient to warrant judicial notice of a shift in public policy with respect to legalized gambling, such a shift would not be inconsistent with a continued public policy disfavoring gambling on credit. *See, e.g., King International Corp. v. Voloshin*, 33 Conn. Supp. 166, 366 A.2d 1172, 1174 (Super.Ct.1976) ("It

---

[19] Docket 16, Exhibit F, p. 11.

is not incongruous for a legislature to sanction certain forms of gambling and still refuse the collection of gambling debts.").[20]

In *Aubin II*, the Fifth Circuit explained that while public policy prohibiting gambling in Texas has dimished,[21] public policy to gambling <u>on credit</u> has not.[22]

4. Does it matter if the payee bank is a mega-national bank?

The bank mergers and combinations of local banks into national banks in the last two decades and the virtual elimination of local banks raises some doubt about the weight of jurisprudential conclusions relying on the statements that the debts are to be paid by "Texas banks." But PNK has provided no authority for the conclusion that the merger of a banking organization changes the choice of law provisions for contracts between parties, neither of which is a bank. This Court reads *Aubin* and *Aubin II* to hold that Texas' interest in the choice of law provision relates to protection of its citizens and their economic well being by prohibiting gambling <u>on credit</u>. Thus, what is at issue is not the location of the payee bank, but the location of the party who will be affected by enforcement of the contract. As the Fifth Circuit stated:

In *Aubin I,* Judge Garwood, writing for the panel, concluded that although public policy in Texas may have shifted with regard to gambling, as evidenced by the enactment of statutes legalizing certain forms of gambling, there was a continued public policy in the Lone Star State which disfavors gambling on credit.[23]

Therefore, unless instructed by higher authority to the contrary, this Court interprets the combined *Aubin* cases as concluding that the prevailing Texas interest in the choice of law provisions does not depend on whether the payor bank is a small state bank or a mega national bank, but on where the payment of the markers will have its economic consequences.

Because *Aubin* II is binding precedent, the Court finds that applying Louisiana law in this case would be contrary to a fundamental and still relevant policy of Texas.

C. Bankruptcy Conflict Preemption

PNK's final argument is bankruptcy preemption. PNK cites *Mirage-Casino Hotel v. Simpson* in support of its argument. There, the United States Bankruptcy Court for the Middle District of Florida, Orlando Division cited *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 162-63 (1946) for the proposition that:

> The term "claim" is given the broadest possible meaning due to the Congressional intent to bring all legal obligations of a debtor within the bankruptcy case. Application of conflict pre-emption subrogates Florida's statutory provision of non-enforcement of gambling debts to the

---

[20] *Aubin I* at 625 (footnotes omitted).
[21] As noted in the concurring opinion of Judge Vela, not by "evolution" but by "revolution."
[22] *See* the text at footnote 25 below.
[23] *Aubin II* at 718.

comprehensive federal bankruptcy scheme crafted by Congress, through the authority of the United States Constitution. Plaintiff's claims for gambling debts, normally unenforceable in Florida are deemed enforceable.[24]

The facts in *Mirage-Casino Hotel* were similar to those at bar. However, the Court finds the United States Bankruptcy Court for the Northern District of Texas, Dallas Division's discussion of *Vanston* more instructive and persuasive:

> In *Vanston . . .*, the Supreme Court held that in determining the allowance of a claim against a bankruptcy estate, the bankruptcy court does not apply the law of the state in which it sits. Rather, the doctrine of Erie R. Co. v. Tompkins would not apply, but the court, instead, should conduct its own choice of law assessment. *Vanston,* 329 U.S. at 162-63. *See also In re Consolidated Capital Equities Corp.*, 143 B.R. 80 (Bankr. N.D. Tex. 1992). The bankruptcy court must allow a claim "except to the extent that (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1). *The bankruptcy court determines applicable non-bankruptcy law by examining the equities and the contacts of the transaction and the parties*. *See Vanston*, 329 U.S. at 162-63 (emphasis added).[25]

The equities, contacts, transaction, and consequences in this case favor applying the law of Texas. The law of Texas (via *Aubin*) does not allow debts arising from gambling on credit in which the party extending the credit is a party to the gambling. Therefore, PNK's bankruptcy conflict preemption theory also fails.

D.    Conclusion: Texas Law Applies

Based on the foregoing, the Court finds that Texas law, *see Aubin*, applies to this case. Because *Aubin* applies, we hold that PNK does not possess an allowable claim against Debtor.

## IV.    DISCHARGEABILITY OF THE DEBT TO PNK

PNK alleges that the Debtor's $20,000 obligation is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A)-(a)(2)(B) because: (i) Debtor obtained the funds by false pretenses, a false representation, or actual fraud, and (ii) Debtor made use of a statement in writing that was materially false with respect to Debtor's financial condition on which PNK reasonably relied and which Debtor caused to be made or published with intent to deceive. Section 523(a)(2) provides:

---

[24] *Mirage-Casino Hotel v. Simpson (In re Simpson)*, 319 B.R. 256, 265 (Bankr. M.D. Fla. 2003).
[25] *Professional Investors Ins. Group, Inc. v. United Overseas Bank, S.A. (In re Professional Investors Ins. Group)*, 232 B.R. 870, 884 (Bankr. N.D. Tex. 1999).

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>>
>>> (B) use of a statement in writing—
>>> (i) that is materially false;
>>>
>>> (ii) respecting the debtor's or an insider's financial condition;
>>>
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>>
>>> (iv) that the debtor caused to be made or published with intent to deceive . . . .[26]

Here, the key language is "does not discharge an individual debtor from *any debt* . . . ." (emphasis added). In short, the whole of § 523(a)(2) depends upon the existence of a debt between the debtor and the party objecting to the debtor's discharge.

As *Aubin* II recognizes, if no enforceable debt exists, then a claim of fraud based on that debt also fails.[27] Taking the Fifth Circuit's language from *Aubin* II and applying it here is particularly illustrative:

> Under Texas law, [Debtor] is not obligated to pay the gambling debt. Thus, the unenforceability of the gambling debt is what gives rise to [PNK's] "loss," and this occurred by operation of law, not because of anything [Debtor] did or did not do. Moreover, any alleged wrongdoing or misrepresentation on the part of [Debtor] is so inextricably interwoven with the underlying gambling debt, which *Aubin* I declared to be unenforceable, that [making a] finding of fraud would render our opinion utterly inconsistent with *Aubin* I.
>
> . . .

---

[26] 11 U.S.C. §§ 523(a)(2)(A)-(a)(2)(B) (2006).

[27] *Aubin II* at 719: ("Carnival claims that Aubin's signing of the markers constitutes a fraudulent misrepresentation . . . . Carnival's arguments focus on its contention that the language . . . on the face of the markers constituted a material misrepresentation by Aubin that there were sufficient funds in his Houston bank account and that he would repay the debt.").

>To [PNK's] other arguments contending that [Debtor] should be liable for fraudulently signing the negotiable instrument, we likewise say "no dice." Thus, [Debtor] has hit the jackpot and [PNK] craps out.[28]

Accordingly, PNK's objections to Debtor's discharge are denied for failure to state a claim on which relief can be granted.

SIGNED 07/08/2009.

_Wesley W. Steen_
Wesley W. Steen
United States Bankruptcy Judge

---

[28] *Id.*